UNITED STATES *v.* AMERICAN METAL CO., LTD. (No. 2442).[1]

1. CONSTRUCTION, SECTIONS 489, TARIFF ACT OF 1922, AND 195 AND 198, JUDICIAL CODE.

Under sections 195 and 198, Judicial Code, the Court of Customs Appeals has jurisdiction to review the action of the Board of United States General Appraisers on a petition filed under section 489, tariff act of 1922, for the remission of additional duties; and this review covers both law and fact. Such decision by the board is final, and not interlocutory.—Fish *v.* United States (12 Ct. Cust. Appls. 307; T. D. 40315).

[1] T. D. 40612.

2. SECTION 489, TARIFF ACT OF 1922—FORFEITURES—ADDITIONAL DUTIES—
    FRAUD.

Section 489, tariff act of 1922, levies additional duties for undervaluation
and declares a forfeiture if the appraised exceeds the entered value by more
than 100 per cent. The additional duty and the forfeiture are separate, dis-
tinct, concurrent, and cumulative. The additional duty is not penal, is
irrespective of fraud, and is levied, collected, and defended against just as
other duties are. The forfeiture is penal, depends upon fraud, and is prose-
cuted and defended under the rules of law governing forfeitures. The addi-
tional duty is within the jurisdiction of this court, but the forfeiture is not.
Consequently that provision of the section which declares the entry pre-
sumptively fraudulent if it is exceeded in value by the appraisal by more than
100 per cent relates to the forfeiture only, and not to the additional duty.
The petition for the remission of additional duty may be filed under the sec-
tion even though the undervaluation exceeds 100 per cent.

3. REMISSION OF ADDITIONAL DUTY UNDER SECTION 489, TARIFF ACT OF
    1913—BOARD PRESUMPTIVELY RIGHT.

In the consideration by the Board of United States General Appraisers of a
petition for remission of additional duties under section 489, tariff act of 1922,
the importer's good faith is in issue notwithstanding that the undervaluation
exceeds 100 per cent; and the judgment of the Board of United States General
Appraisers not appearing to be either unsupported by the evidence or clearly
contrary to the weight of it, is affirmed.

United States Court of Customs Appeals, January 3, 1925

APPEAL from Board of United States General Appraisers, G. A. 8814 (T. D. 40244)

[Affirmed.]

*William W. Hoppin,* Assistant Attorney General (*John A. Kemp,* special
attorney, of counsel), for the United States.
*Brooks & Brooks* (*Frederick W. Brooks, jr.,* of counsel), for appellee.

[Oral argument Nov. 14, 1924, by Mr. Hoppin and Mr. Frederick W. Brooks, jr.]

Before GRAHAM, Presiding Judge, and SMITH, BARBER, BLAND, and HATFIELD,
Associate Judges

GRAHAM, Presiding Judge, delivered the opinion of the court:

The importer filed a petition for remission of additional duties
under section 489 of the tariff act of 1922. The Board of General
Appraisers entered judgment sustaining the petition, and the Gov-
ernment appeals.

The appellee moves to dismiss the appeal on the ground that this
court has no jurisdiction thereof. In Brown *v.* United States (12
Ct. Cust. Appls. 93, T. D. 40026) and in Fish *v.* United States (12
Ct. Cust. Appls. 307, T. D. 40315) we held otherwise. The matter is
therefore stare decisis in this court, and the motion to dismiss is
denied.

The appellant here argues that section 489 does not authorize any
proceedings for the remission of additional duties where the appraised
value of the merchandise imported exceeds the value declared in the
entry by more than 100 per cent; that, in view of the direction of

the statute that in such cases the goods imported shall be seized and proceedings had against the same as in cases of forfeiture, the proceeding for forfeiture is mandatory and excludes any right of the importer to relief under the preceding portion of the section.

Provisions similar to section 489 have appeared in former tariff acts since and including the customs administrative act of June 10, 1890. Section 7 of the last-named statute provided, in part, as follows:

* * * and if the appraised value of any article of imported merchandise shall exceed by more than ten per centum the value declared in the entry, there shall be levied, collected, and paid, in addition to the duties imposed by law on such merchandise, a further sum equal to two per centum of the total appraised value for each one per centum that such appraised value exceeds the value declared in the entry; and the additional duties shall only apply to the particular article or articles in each invoice which are undervalued; and if such appraised value shall exceed the value declared in the entry more than forty per centum, such entry may be held to be presumptively fraudulent, and the collector of customs may seize such merchandise and proceed as in cases of forfeiture for violations of the customs laws.

Section 32 of the act of July 24, 1897, amended the language above noted in some particulars, particularly by making an additional duty of 1 per cent of the total appraised value for each 1 per cent that such appraised value exceeded the entered value and by limiting the total additional duty to 50 per cent of the appraised value of the importation, making a similar change in the forfeiture section. The act of August 5, 1909, section 7 of section 28, limited the additional recovery to 75 per cent of the appraised value and made a similar change in the forfeiture section. Paragraph I of Section III, act of October 3, 1913, was substantially the same as the similar provision in the act of 1909. Section 489 of the tariff act of 1922 continues the general plan, first given expression in the act of 1890 above quoted, but changes the forfeiture clause by making it applicable only when the appraised value of the merchandise exceeds the entered value by more than 100 per cent.

In cases where the statutes heretofore cited have been discussed, it has been uniformly held that proceedings for forfeiture of the goods imported may be conducted in the courts concurrently or at different times, with the collection of the additional duties specified in such statutes for undervaluation by the collector, and a clear distinction has been recognized between the two remedies provided. Prior to the act of July 24, 1897, the assessment of such additional duties was held to be punitive and penal.—Helwig v. United States (188 U. S. 605). That case distinguished section 7 of the act of June 10, 1890, above cited, from the act of July 24, 1897, pointing out that in the latter act Congress had plainly directed that the additional duty therein spoken of should not be construed as a penalty. Since the act of 1897 it has been uniformly held that the additional duties

due on account of undervaluation are to be treated and collected as other duties and that the element of fraud does not at all enter into the consideration of the matter. On the contrary, actions for a forfeiture under the succeeding language of the various acts have been held to be penal in their nature and to be subject to all the defenses which can be ordinarily made against such actions.

In United States *v.* One Case Paintings (99 Fed. 426), the goods were forfeited under section 32 of the act of 1897, and thereafter, by order of the District Court of the United States for the Southern District of New York, the amount of duties paid was ordered to be refunded. This was held to be error, and the court said, in commenting on the nature of section 32, the following:

That provides only for a penalty to be exacted when the importer fraudulently undervalues his goods. The fact that such penalty involves a forfeiture of the whole package undervalued is in no way inconsistent with the other provision of statute which requires the importer to pay duty. "Importation" and "fraudulent undervaluation" are two distinct acts. The doing of the one act makes the importer a debtor to the Government for the amount of duties, the doing of the other act makes him lose his goods; but there is nothing in the language of section 32 which can be construed as a remission of the obligation to pay duties in any event.

In United States *v.* 1,621 Pounds of Fur Clippings (106 Fed. 161) the same court, in further comment on the statute above cited, said:

Under this statute the additional duties are payable except in cases arising from a manifest clerical error, irrespective of any question of fraudulent undervaluation on the part of the importer.

To the same effect are United States *v.* Gray (107 Fed. 104, affirmed in 113 Fed. 213). In United States *v.* Bishop (125 Fed. 181), the court, in commenting on section 32 of the act of July 24 1897, said, omitting the citations there given:

The conclusion is irresistible that under section 32 of the tariff law of July 24, 1897, the fraudulent intent of the owner or of his agent in entering the imported merchandise is an indispensable condition of the right of the Government to forfeit the goods for undervaluation. But an action to recover the additional duties accruing upon an undervaluation may be maintained against the consignee under this section, and under section 3058, Revised Statutes, as amended, in the absence of any fraudulent intent by the consignee, the owner, or the agent. Good faith and innocence constitute no defense to such an action.

In the case of The Lace House *v.* United States (141 Fed. 869), it was held that the fact that goods have been seized for undervaluation did not deprive the consignee or owner of the right of reappraisement given in section 13 of the customs administrative act of 1890, and that the same principle would apply with like reason to the right of the collector or surveyor to call for a reappraisement in the case of goods seized for forfeiture. Along the same general

lines see T. D. 23749 (5 Treas. Dec. 432); T. D. 27887 (13 Treas. Dec. 117); T. D. 26612 (10 Treas. Dec. 79).

It is manifest, from what seems to be the uniform trend of authority on the subject, that the courts have always considered this statute as giving two separate and distinct remedies for undervaluation, the one being by way of increased duties and the other punitive, by way of forfeiture, and that the pursuit of one does not interfere with, or prevent the pursuit of the other. The forfeitures under such statutes must, of course, be sought in the district courts of the United States. Such matters are beyond the jurisdiction of this court.—Sheldon v. United States (8 Ct. Cust. Appls. 215; T. D. 37455). On the other hand, all matters relative to the assessment and collection of additional duties are plainly within the jurisdiction of this court. This being true, and the statute providing for separate remedies to be pursued in separate tribunals, it follows that the language in the latter portion of the section, raising the presumption of fraud when the appraised value exceeds the value declared in the entry by more than 100 per cent, must be held to apply to the proceedings for forfeiture, and to be a rule of evidence in such cases. This is further made evident by the succeeding language of the section, namely:

* * * and in any legal proceedings other than a criminal prosecution that may result from such seizure, the undervaluation as shown by the appraisal shall be presumptive evidence of fraud, and the burden of proof shall be on the claimant to rebut the same, and forfeiture shall be adjudged unless he rebuts such presumption of fraud by sufficient evidence.

It is manifest that such language, applicable to proceedings for forfeiture, does not limit and qualify the language of the section relating to proceedings for the collection of additional duties. Nor should the proceedings for forfeiture in such cases be held to be exclusive where the amount of undervaluation is over 100 per cent. In our opinion, a petition for remission can be properly filed under this section and action had thereon by the Board of General Appraisers, even though the amount of undervaluation may exceed 100 per cent, the recovery, however, being limited in any case to 75 per cent.

This court, in Fish v. United States (12 Ct. Cust. Appls. 307; T. D. 40315), adopted the rule stated in the Van Blankenstyn case (56 Fed. 474) as applicable in cases of review by the court of proceedings before the Board of General Appraisers for remission of additional duties under section 489. That rule was there stated:

The circuit court should not undertake to disturb the findings of the board upon doubtful questions of fact, and especially as to questions of fact which turn upon the intelligence and credibility of witnesses who have been produced before the board. But when the finding of fact is wholly without evidence to support it, or, when it is clearly contrary to the weight of evidence, it is the duty of the circuit court to disregard it.

It only remains to examine the testimony taken below and measure it by the rule stated.

The evidence shows that early in 1921, and thereafter until the sale of said material to the importer, Sir Arthur Whinney, as the liquidator of the bankrupt estate of Electro Thermo Co. (Ltd.) at Luton, England, was in possession of 96 tons of ferrotungsten and 74 tons of tungsten powder. In July, 1922, the representative of Elton, Levy & Co., metal merchants and smelters, of Edmonton, England, approached the liquidator as to the possibility of buying the material in question. At that time, and for a considerable period prior thereto, Elton, Levy & Co. and Marshall Bros. & Co. were, and had been, closely associated as agents and otherwise with the American Metal Co. in their business of buying and selling metals. Prior to the said conference with the liquidator in July, Elton, Levy & Co. had advised Marshall Bros. of the availability of the material, and they in turn had cabled this information to the American Metal Co. In response to this cablegram, the American Metal Co. advised their representative, Marshall Bros. & Co., that it was believed this material could be disposed of in the American market. Thereupon in July, 1922, Elton, Levy & Co., acting on the joint account of themselves, Marshall Bros. & Co., and the appellee here, offered the liquidator £90 a ton for the material, which offer was refused, and the matter was dropped for the time; afterwards, in September, 1922, the liquidator approached Elton, Levy & Co. with an offer to accept £96 per ton; this offer was accepted September 11, 1922, and the appellee here advised of this fact by letter written and mailed the same day. The importer was advised of the imminence of the passage and approval of the tariff act of 1922, and to get the advantage of the tariff rates of the act of October 3, 1913, rushed the goods by fast train and steamers to the United States. The goods, however, were not entered at the port of New York until September 27 and 28, and hence were subject to the rates provided by the tariff act of 1922.

The material was entered by brokers at the purchase value, £96 per ton, for warehousing. Thereafter it was appraised and the tungsten powder advanced in value over 100 per cent, and the ferrotungsten advanced approximately 41 per cent, which appraisement was sustained by a single general appraiser, from whose decision no appeal to reappraisement was prayed.

The evidence shows the liquidator had made all possible efforts to sell this material, but without avail. It had been freely offered to the trade in England and elsewhere for several months, but no offer had been received which could be recommended to the debenture holders. The best bid received was on September 2, 1922, of approximately £50 a ton for 14 tons 18 hundredweight. Large war stocks of this material were still undisposed of in England at this time, and the testimony is undisputed that there was no market

there for the amount of material in question here, nor for anything except very small quantities of ferrotungsten and tungsten powder. Although the dutiable valuation of this importation is res adjudicata here, it is yet proper to consider the facts shown on this record as to foreign valuation in connection with the petition for remission filed herein. So far as the record here goes the price paid by the importer for this material was at the time the market value for such material in England, offered to the public as it was. There had been an analysis made which appeared among the records of the bankrupt concern, which was in the liquidator's hands, and a copy of which had been furnished the importer before purchase, but the liquidator was not certain it applied to the material in question and would make no guaranty of the metallic content of the goods in question.

The importer also had an opportunity to obtain a sample for analysis before purchase but had no analysis made until after purchase and importation. None of the importing companies knew at the time of purchase or importation exactly what the metallic content of the importation was, but upon analysis by them it was found the material was practically the standard ferrotungsten and tungsten powder of commerce and worth the appraised value. The importers ordered an analysis to be made by competent chemists on the day the importation arrived, but did not receive the result of this analysis until two or three months after this date. On the other hand, a witness for the Government states that the analysis could have been made in a day. The importer instructed its brokers, by letter dated September 28, to enter the goods, and in this letter instructed them to enter it as "ferrotungsten, 81 per cent tungsten," and "tungsten powder, 97 per cent tungsten," which was done.

The importer knew at the time of purchase what the value of standard material of this kind was on the American market. There is no proof in the record except such as might be inferred from the general conduct of appellee that any fraud upon the customs was intended. It seems to be simply a case where the appellee and its associates purchased a quantity of material on a venture, without the ordinary commercial precautions, hoping that on importation and analysis the material would be found to be of standard strength and that their material, being imported under the lower rates of the tariff act of October 3, 1913, would be enhanced in price after importation by the coming into effect of the tariff act of 1922. There was no attempt made by the importer, evidently, to conceal the true nature of the goods imported.

This is substantially the evidence as shown by the record. Upon it the Board of General Appraisers found that the undervaluation by the importers was without any intention to defraud the revenue

of the United States or to conceal or misrepresent the facts of the case or to deceive the appraiser as to the value of the merchandise. The board heard the witnesses and had a better opportunity of judging of their credibility than has this court. Under the provisions of section 489, authorizing such proceedings as are here involved, the issue is one largely of the good faith and intentions of the importer as shown by the facts. Congress has seen fit to liberalize this statute from its old rigid and inelastic form, and has used language plain and unequivocal in so doing, giving large discretion to the Board of General Appraisers in such cases. We do not wish to be understood as indicating in any manner here that the importer can in such cases avow his good faith and intentions and ipso facto avoid the imposition of the additional duty. Such a practice would lead to endless abuses and frauds upon the customs, and the statute would, as suggested by counsel for the Government here, become a nullity. Nor can he stand by, having an opportunity to inform himself of the value of his importation, and excuse himself alone by his ignorance of its true value.

In the case at bar, however, much testimony aside from that of the importer was introduced and many incidental facts presented. The evidence was conflicting and various deductions might be drawn therefrom. We can not say that the finding of the Board of General Appraisers was without evidence to support it, nor can we say it was clearly contrary to the weight of the evidence in the case. Such being true, the judgment of the Board of General Appraisers should be and is *affirmed.*