CELANESE CORP. OF AMERICA *v.* UNITED STATES (No. 3364)[1]

[1] T. D. 44680.

**418**

United States Court of Customs and Patent Appeals, March 2, 1931

*Blackman, Pratt & King (Addison S. Pratt* of counsel) for appellant.
*Charles D. Lawrence,* Assistant Attorney General (*Thomas J. Canty* and *Ralph Folks,* special attorneys, of counsel), for the United States.

[Oral argument February 5, 1931, by Mr. Pratt and Mr. Folks]

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT Associate Judges

GRAHAM, Presiding Judge, delivered the opinion of the court:

An appeal has been prayed by the appellant from an order of the United States Customs Court, denying appellant's petition for a remission of additional duties under section 489 of the Tariff Act of 1922.

The facts presented by the voluminous record are, briefly, as follows: The appellant, Celanese Corp. of America, is engaged in the manufacture of artificial silk filaments and thread from cellulose acetate, at its plant in Cumberland, Md. In 1927 the appellant began building an addition to its plant at Cumberland, for which it needed additional machines, and negotiations were opened with British Celanese (Ltd.) for the purchase of these machines. The machines finally purchased and imported were 12 machines with metier cases or cabinets, and 12 without such cases, all of which were shipped in a knocked-down condition and later set up at appellant's plant in Cumberland. The machines were very cumbersome, each being about 40 or 50 feet in length, 12 feet high, and 6 feet wide. After the machines had been set up they were appraised at the plant at the cost of production thereof. It is admitted by all parties that there was no foreign, export, or United States value of said goods.

It appears from the record that while the appellant is a separate corporation from British Celanese (Ltd.) there is an interlocking directorate and approximately 33,000 shares of the stock of the American corporation is owned by the British corporation. The managing director of the British corporation and the president of the appellant is the same individual. It appears, also, that appellant has another corporate associate known as the Canada Celanese, carrying on the same kind of business in Canada. In addition, it appears that the appellant carries a balance of from 40,000 to 100,000 pounds in England, and when British Celanese (Ltd.) has an unliquidated account

against the appellant, a representative of appellant who has his office with the British company, audits the account, and the same is paid in England by an official of the British company, selected by appellant for that purpose, after which a monthly report is sent to the appellant. The relations between the companies are of the closest character. This is indicated by the testimony of William McCallum Cameron, first vice president of appellant, who testified, among other things, in response to the question "What is Spondon design?" "Spondon is a town. It is a place where the British factory is located. *Our British factory* is usually referred to by us as Spondon." (Italics ours.)

The shipments over which the controversy in issue arises were made beginning December 27, 1927, and ending June 29, 1928, and were eight in number. They were entered by appellant at a total value of $176,348.53, or £36,237 4s. 9d. The final appraised value was $213,911.29, or £43,955 17s. 8d.

It fairly appears, from the record, that the appellant had been purchasing similar machines prior to these purchases from Vickers (Ltd.) and Prince, Smith & Sons, in England, but when it communicated with the British Celanese (Ltd.), through whose office it transacted its business of this kind, as to the purchase of the imported machines, the British company desired to construct these machines in its own factory, instead of placing the orders elsewhere, the reason given being that its trade secrets otherwise might be divulged to others in the same business. Therefore, the order was placed with British Celanese (Ltd.).

The correspondence between the appellant and its British company appears in the record. Most of this correspondence was by way of cablegram. On August 17, 1927, the order was placed by appellant, through its vice president, Cameron, for 12 machines, and on August 26, 1927, arrangements were made for 12 other machines. On September 22, 1927, the British company notified appellant, by cablegram, as follows:

Nine thirty metiers your cablegrams four hundred six and eight please confirm with official order Stop Estimates cost sixty six thousand pounds Stop As have lot of outlays should be glad if you would remit thirty three thousand pounds on account

On the same day Cameron cabled the British company, asking it to send "at least estimates of cost each item enumerated on our requisitions."

On September 23, 1927, Cameron communicated with the British company as follows:

* * * You will also note from the above cable that while we have remitted £33,000 on account of these orders as requested, we would like very much to have some idea, or at least as close an estimate as you can give us, of the cost to us of the items appearing on those orders. Possibly, as you have made up some estimate apparently, you could give us the estimated detail as applied to the items. If so, it would assist us, and I would be greatly obliged.

In answer to this, on October 8, 1927, the British company replied as follows:

With regard to the cost of these machines we are taking urgent steps to arrive at a reasonable estimate, for which purpose we are basing our calculations on actual purchase prices of material as far as possible. In addition to this, of course, there is the question of patterns, jigs, and tools, and also cost of fitting and assembling. We hope to give you a reasonably close figure in the course of mail, for which purpose the departments concerned are in close collaboration.

Nothing further appears in the correspondence between these companies until April 20, 1928, when the appellant was advised by its representative in England as follows:

Since cabling the cash position as at 1st March, when the value of the machinery shipped was given as £50,000, which value was based on the original estimate of £66,000, we have had an opportunity of going into the position of the spinning machinery order, against which you advanced £33,000, and find that up to 31st March machinery of a total invoice value of £27,727 17s. 7d. has been shipped. We further learn from Spondon that the original estimate of the cost of this order was considerably in excess of what the actual cost will be when completed. It would therefore seem to simplify matters by taking the full value of the invoices against the advance, and this you will notice we have done.

On December 29, 1928, British Celanese (Ltd.) notified appellant that it was sending the final invoice and that the total cost was £63,394 3s. 7d., of which £33,000 had been paid, leaving a balance of £30,394 3s. 7d. remaining due and unpaid.

On April 9, 1929, the Treasury Department requested information on these importations from the representative of the Government in London, and on June 3, 1929, customs attaché Marquis forwarded a report thereon. In this report the customs attaché estimated the cost of production of the imported goods to be £58,479 6s. 0d., making allowances for depreciation. He also attached to his report a copy of the said British Celanese (Ltd.) final invoice forwarded December 29, 1928.

The goods were examined at Cumberland, for appraisement, by Frederick A. Rouse, chief examiner at the port of Baltimore, on March 18 and 19, 1929. The examiner had, at that time, the consular invoices upon which the entries were made. He testified that he did not know of the said final invoice sent December 29, 1928, until he later learned it from the said report of customs attaché Marquis and that his attention was not called to it by the appellant, or any of its agents, at the time of examination. The examiner testified that at the time of said examination, the entries of these machines had not come under the observation of the appraiser and amendments might have been then made therein to show the correct dutiable value of these goods. This witness also interviewed the broker who had made the entries and received no further information from him than was contained in the consular invoices. It further appears from

the record that the advances in value made by the appraiser were made on June 29, 1929.

On behalf of the appellant a witness, William O. Henley, an accountant at appellant's factory, testified that he gave examiner Rouse all the files relative to the transaction, including a copy of the final invoice of December 29, 1928, which was in the 1929 folder; he stated, however, that he did not specifically call Rouse's attention to said invoice.

In addition to these matters, the appellant called witnesses who testified to appellant's good faith in making the said entries and who gave as a reason for no greater dutiable value being given that appellant had tried to obtain the total cost of production and was unable to do so. In addition, it is claimed that the responsible officials of appellant were justified in assuming that the consular invoices represented the true cost of production, and that they had no way of knowing they were to be charged with a part of the large additional cost of building plant, etc., or that such items, if charged, would constitute a part of dutiable value.

We agree with the court below that the facts presented here are not satisfactory evidence upon which to base remission of duty under this statute. The fact that a large amount of duty is involved does not affect the legal principles involved to any degree. The appellant knew from the beginning, long prior to the first entry, that the estimated cost of these goods was to be approximately £66,000. It made no effort to inform the customs officials of these facts exclusively within its knowledge. It made no effort to amend its entries and state the true facts, even when it had the opportunity to do so without incurring additional duties for undervaluation. The United States Customs Court and this court have repeatedly announced the principles of law applicable to such cases. Some of these cases are: *Fish* v. *United States*, 12 Ct. Cust. Appls. 307, T. D. 40315; *Wolf* v. *United States*, 13 Ct. Cust. Appls. 589, T. D. 41453; *Stone & Downer* v. *United States*, 13 Ct. Cust. Appls. 649, T. D. 41488; *Syndicate Trading Co.* v. *United States*, 13 Ct. Cust. Appls. 409, T. D. 41339; *United States* v. *American Metals Co. (Ltd.)*, 12 Ct. Cust. Appls. 440, T. D. 40612; *Finsilver, Still & Moss* v. *United States*, 13 Ct. Cust. Appls. 332, T. D. 41250.

There was no error in the judgment below and it is *affirmed*.

Hatfield, J., dissents.