(C. D. 1252)

· FRANK ALVAREZ *v.* UNITED STATES

United States Customs Court, First Division

(Decided June 14, 1950)

*Philip Stein* (*Philip Stein* and *Marjorie M. Shostak* of counsel) for the petitioner.
*David N. Edelstein,* Assistant Attorney General (*Richard H. Welsh* and *Harold L. Grossman,* special attorneys), for the respondent.

Before OLIVER, COLE, and MOLLISON, Judges

COLE, Judge: The provisions of section 489 of the Tariff Act of 1930 (19 U. S. C. § 1489) are invoked in this case to obtain remission of additional duties accruing by reason of the final appraised values exceeding the entered values of several items of leather goods exported from Mexico and entered at the port of Laredo, Tex.

Petitioner introduced his direct case at New Orleans, where he has his place of business. He, personally, purchased all of the items in question while in Mexico during March 1943, approximately 3 years after he began importing. Each item was given a letter that served to identify the contents of separate packages, which he, himself, put into two boxes, numbered 26 and 27, took to the railroad station, and shipped to the customs broker in Laredo, Tex., for entry purposes.

Two weeks later, petitioner arrived in Laredo, and after being advised by his customs broker, Jovita Perez, that his merchandise had not arrived, he gave her the purchase invoices and then proceeded to New Orleans. Between April, his time of arrival in New Orleans, and September, when the merchandise was entered at Laredo, he communicated several times with the customs broker, asking for the whereabouts of the merchandise. Petitioner, however, did not produce any of such correspondence. The only letters offered at this time were an exchange of correspondence (petitioner's collective exhibit 1), bearing dates in October 1943, subsequent to entry, and showing inquiry by petitioner and reply by the broker that "the leather goods are at the American Customs BUT under investigation."

In September 1943, request was received from the broker for $600, the amount of estimated duties. Later, and on December 2, 1943, further request was made for an added amount of $777.88 to cover additional duties, and at the same time notice of short shipment was received.

Although petitioner expected an increase in value over his invoice prices, he never advised the customs broker of subsequent shipments, received between the dates of purchase and entry of the present merchandise, of identical articles at higher prices. He "took it for granted" that the broker, located in Laredo, "would be better acquainted with the prices than I," and that if additional duty was needed or an amendment was to be made he would be so advised just as was done at New Orleans. His dealings with a customs broker were very limited as most previous experience was with informal entries, bringing goods through Laredo in a personally owned automobile and then shipping them in bond, on his own documents, to New Orleans.

The testimony of a customs examiner stationed at the port of New Orleans, and called by respondent, was an evaluation of petitioner's general conduct since the latter part of 1939 or the early part of 1940, "when he began importing through the port of New Orleans." Since that time, the customs examiner had talked with petitioner "quite often" on questions of value relating to various types of Mexican and Cuban merchandise, including leather goods. On several occasions, petitioner withheld "papers in the files which he should have shown" in making entries, and "quite a few times" charges were made against him on matters of valuation. The customs examiner would not characterize petitioner as a "dishonest" importer, but expressed the opinion that "He could have given us information that he had. He knows the law. He has been importing long enough."

Following presentation of the foregoing testimony, the case was transferred, at the Government's request, to Laredo, Tex., where the customs broker, who made the entry, appeared on behalf of respond-

ent. She has been in the customs brokerage business for more than 20 years, and met petitioner sometime between 1935 and 1939 when she discussed with him the requirement of supplying customs officials with all necessary information, and explained "all the technicalities that are involved in Customs handling as far as values and subsequent orders" are concerned, and the necessity of advising the customs broker of "subsequent orders and market value; whether or not he had special prices, and all those things."

Speaking of petitioner's usual method of doing business, the witness stated that in "every shipment I had from him, there was always great confusion," and then added, "I don't know whether he just didn't take the pains to do the things the way he should, or because he didn't know." The broker considered petitioner to be an honest man but was "in no position to guess his intentions" and she doubted that he tried to deceive customs officials or defraud the revenue of the United States.

Petitioner visited the customs broker two or three times concerning "this particular shipment, because he wanted me [the broker] to use my own bond again, and the first shipments were handled in bond. I wouldn't handle them under my own bond. Then he prepared his own bond so I could handle this and other importations."

Approximately 5 months after purchase of this merchandise and 1 month before entry, the customs broker and petitioner had a telephone conversation, disclosed through the following testimony:

Q. Did you during the month of August have a telephone conversation with Mr. Alvarez with respect to the value of this very merchandise?—A. I did have a telephone conversation with him. I think I have a letter whereby he confirms that telephone conversation with me. It was on August 23, 1943.

Q. What happened between you and Mr. Alvarez on that date?—A. I requested him to send me all the papers.

Q. Was this by phone?—A. Yes. I requested him to send me all the invoices, subsequent orders, and all the information so I could file that particular entry.

Q. Did he inform you of the existence of any subsequent orders?—A. He told me he was going to send me all the invoices, but he didn't have any subsequent orders, so not to expect copies of them.

This letter from petitioner referred to was received in evidence (petitioner's exhibit 2) and reads as follows: "According to our conversation by telephone today, we are sending you all the copies that we were able to gather and reproduce, practically all the invoices concerning shipment of leather goods and dominoes sets."

After waiting 1 month for invoices, packing lists, and copies of subsequent orders, which never came from petitioner, the broker sent him a telegram asking for $600 to cover the duty. Before making the entry on September 23, 1943, the broker submitted to the appraiser a "submission sheet," which was returned showing that the customs officials had no information on value so the invoice prices were used.

At a later hearing at New Orleans, and the one at which the case was finally submitted, petitioner testified in rebuttal. Such testimony, however, was directed exclusively toward refuting statements made by the customs examiner, the Government witness at the first hearing in New Orleans. In this connection, petitioner testified that he never deliberately withheld any information from customs officials although he admitted that all of his entries, except informal ones, were made through a broker and never by himself. It is significant that no attempt was made to dispute the customs broker's testimony to the effect that petitioner withheld not only all information concerning subsequent purchases of identical merchandise at higher prices but also documents and papers bearing on the question of value. That phase of the broker's testimony, uncontradicted herein, is a strong indication of petitioner's attitude in the matter and reveals a disposition of indifference toward attempting to make entry at proper dutiable values.

Counsel for the respective parties, in their briefs, discuss at length a letter purported to have been written by petitioner to the collector of customs at Laredo on October 25, 1943, approximately 1 month after the entry in question was made. The alleged letter was never offered in evidence. In fact, it is not mentioned anywhere in the record. Ample opportunity was available either at New Orleans, where petitioner testified, or at Laredo, where the customs officials were located, to present competent evidence toward establishing as facts the contents of the paper referred to. It is not a matter for consideration at this time.

While the proof before us is sufficient to say that petitioner is an honest importer, as testimony of the Government witnesses discloses, the record is equally clear and convincing that petitioner was grossly careless and showed an inexcusable lack of cooperation with either his customs broker or customs officials to have entry made at correct dutiable values.

Petitioner attempted to minimize his experience in customs matters, but the customs broker testified she had made "several entries" for him. Furthermore, he had been informed by the customs examiner at New Orleans, as well as by the broker, of all customs rules and regulations so he must have had full knowledge of his duty to make entry at a value prescribed by law. That he does not speak English fluently, is no excuse to relieve him of his obligation. It is conceivable that if petitioner had exercised the care and diligence required of an importer in making entry of merchandise there would have been no occasion for this litigation.

In his brief, counsel for petitioner states that "mitigating circumstances which prevented the entry of the merchandise herein from being made at its proper dutiable value were the absence of the im-

porter from the port of entry by reason of the fact that his place of business was located a considerable distance away, and his reliance on his Custom House broker located right at the port of entry to ascertain the dutiable value." *Maid-Rite Garment Co.* v. *United States*, 23 Cust. Ct. 209, Abstract 53729, is cited to support the contention. In that case, an importation of unbleached cotton cloth from Mexico was entered at Laredo, Tex., and the importer (petitioner) employed customs brokers in Philadelphia to attend to the clearance of the merchandise. In granting the petition involved therein, the court found that when the owner of the petitioner company was advised that the appraiser at Laredo would not accept the entered value, he promptly consulted customs officials at Philadelphia and then sent a check to cover the amount of additional duties, but the said check did not arrive at the port of entry until after appraisement had been made and hence too late for valid amendment. The present situation is not a comparable one. In this case, petitioner made no positive effort to have his goods entered properly. Instead, he "took it for granted" that the broker knew more about prices for his merchandise than he, himself.

Counsel for petitioner argues further that "There is no evidence that the petitioner fraudulently or intentionally undervalued the merchandise at bar." In other words, petitioner contends that the Government (respondent) has failed to prove that he (petitioner) acted in bad faith. But this is not the issue in petitions arising under section 489, *supra*, like the one under consideration. Here, as in all cases of this character, the principal question is the good faith and intention of petitioner in entering his merchandise. *United States* v. *American Metal Co., Ltd.*, 12 Ct. Cust. Appls. 440, T. D. 40612. As stated in *Kachurin Drug Co.* v. *United States*, 26 C. C. P. A. (Customs) 356, C. A. D. 41: "It is not a question as to whether the record affirmatively shows that appellant [petitioner] entered the goods in bad faith, but the question is whether or not it has met its burden of proving to the trial court that in making the entries such good faith was exercised as is required by the statute."

Much stress is placed by petitioner on the fact that the entry in question was made during the war period when conditions at Laredo were congested and prices for Mexican merchandise fluctuated considerably, so that it was extremely difficult, if not impossible, to ascertain the proper dutiable value of imported merchandise. It is true, as pointed out in counsel's briefs, there have been cases involving entries made within the said period. *E. H. Corrigan* v. *United States*, 22 Cust. Ct. 347, Abstract 53285; *Edward H. Corrigan* v. *United States*, 22 Cust. Ct. 331, Abstract 53222, reversed in *United States* v. *Edward H. Corrigan*, 38 C. C. P. A. —, C. A. D. 434; *J. G. Philen, Jr., Company* v. *United States*, 23 Cust. Ct. 179, Abstract 53593; and

*Charles T. Wilson Co., Inc.* v. *United States*, 24 Cust. Ct. 66, C. D. 1209. In none of those cases, however, were this court's conclusions, granting the petitions, controlled, to the exclusion of all other considerations, by the fact that the entries were made while crowded conditions prevailed at the ports of entry. On the contrary, a review of them discloses that in each case facts and circumstances were shown to the satisfaction of this court that petitioner made a diligent effort through various sources of information, to obtain the proper value at which to make entry. Whatever importance the court might have attached to prevailing war conditions in the cited cases, the existence of similar conditions at the time of entry in question does not furnish sufficient reason, on the basis of the present record, for granting the relief sought by petitioner herein.

That the customhouse broker sent a "submission sheet" to the appraiser prior to entry of the present merchandise, requesting information on the matter of value, and that the customs officials had no such information to offer at the time, is not to be accepted herein as proof of the good faith of petitioner. The true effect of such procedure was given in *United States* v. *H. S. Dorf & Co. of Pa., Inc.*, 36 C. C. P. A. 29, C. A. D. 392, wherein the court said that "it is no part of the official duty of such officer [appraiser, in this instance] to supply the desired information," and "as indicated in the text of the submission sheet, information so given is in no way binding on customs officials in determining value, nor can such information be relied upon by the entrant to obviate the duty imposed upon him to ascertain and enter the merchandise at its true value."

The added obligation of one making inquiry through the medium of a submission sheet and receiving no information was stated in the *Dorf* case, *supra*, as follows: "Moreover, where a submission sheet has been returned with no information, that fact is sufficient to put a customhouse broker on notice so as to require that he seek further information as to value before making entry. *United States* v. *Aug. F. Stauff & Co.*, 25 C. C. P. A. (Customs) 215, T. D. 49306."

In this case, it is evident that the broker felt she was without proper information as to value. Her communications with petitioner, requesting all available papers and documents as well as copies of subsequent orders, reveal her unwillingness to accept the invoice values without supporting proof. After waiting 1 month, without receiving anything from petitioner, the broker took the most acceptable course by presenting the submission sheet, and when it was returned, showing that the customs authorities had no data on value, there was no other alternative but to enter at the only prices available. The broker's effort, without cooperation from petitioner, as we find herein, cannot be applied to relieve the latter from responsibility that is rightfully his.

It is important to note that only through the careful and intelligent investigation made by the customs personnel were the correct values determined. But for such efficient service, petitioner might "have gotten away with" the erroneous prices at which he permitted the items to be entered.

Petitioner's disposition throughout the entire period between entry and appraisement (approximately 6 months) was contrary to that which the court on numerous occasions has said is required of a petitioner if he is to obtain remission of additional duties under section 489, *supra*. *Wolf & Co.* v. *United States*, 13 Ct. Cust. Appls. 589, T. D. 41453; *National Biscuit Co.* v. *United States*, 20 C. C. P. A. 395, T. D. 46187. Although he expected the appraiser to advance his invoice prices, he, nevertheless, contented himself with a negative course of conduct. His attitude must be branded as possessing that degree of carelessness and negligence having sufficient association with an intention to defraud the revenue of the United States or to conceal or misrepresent the facts of the case or to deceive the appraiser as to the value of the merchandise, as to make the petition for recovery of additional duties, the subject of this litigation, not allowable.

Judgment will be rendered accordingly.

Petitioner's actions in a subsequent entry have no bearing on issues presented herein. And this is so even though the later entry, filed 3 months after the one under consideration, related to items contained in box 27, *supra*, allegedly shipped at the same time the present merchandise was sent. The second entry was a separate transaction for customs purposes. *United States* v. *Pennsylvania Salt Manufacturing Co.*, 26 C. C. P. A. 232, C. A. D. 22, cited by petitioner, contains nothing from which we can draw authority to say that petitioner's good faith in a later entry can be applied to his intentions in an earlier one. It is not unlikely that the exemplary conduct of petitioner when he made his second entry was prompted by his failure in the present case.